1  STEPHEN R. BASSER (121590)
   SAMUEL M. WARD (216562)
2  **BARRACK, RODOS & BACINE**
   One America Plaza
3  600 West Broadway, Suite 900
   San Diego, CA 92101
4  Telephone: (619) 230-0800
   Facsimile: (619) 230-1874
5  *sbasser@barrack.com*
   *sward@barrack.com*
6
   *[Additional Counsel on Signature Page] Counsel for*
7  *Plaintiff Charles Steinberg, individually and*
   *on behalf of all others similarly situated*
8

9

10

11                 **UNITED STATES DISTRICT COURT**
            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
12                        **SAN JOSE DIVISION**

13  CHARLES STEINBERG, individually and
    on behalf of all others similarly situated,
14                                                    **CLASS ACTION COMPLAINT AND**
                    Plaintiff,                        **DEMAND FOR JURY TRIAL**
15
                      v.                              CLASS ACTION
16
    FACEBOOK, INC.,
17
                    Defendant.
18

19

20

21

22

23

24

25

26

1.     Plaintiff, by and through his undersigned counsel, hereby brings this action against Facebook, Inc. ("Facebook" or the "Company"), individually and on behalf of a class of similarly situated persons, and hereby alleges as follows:

I.    **PRELIMINARY STATEMENT**

2.     Facebook, founded in 2004, has since grown to be the world's largest provider of social networking platforms, with its primary offering, the Facebook social network, reaching over 2.7 billion active users worldwide by July 2020. In addition to Facebook itself, the Company owns additional platforms, including Instagram, WhatsApp, and Facebook Messenger. In total, the various Facebook platforms maintain approximately 2.47 billion active daily users and more than 3.1 billion active monthly users.

3.     As set forth below, Facebook holds monopoly power in the personal social networking market in the United States.

4.     Facebook has used the anti-competitive strategy of "acquire, copy, or kill" to maintain its monopoly power and thwart potential competitors. The most prominent examples of the "acquire" prong of the strategy were Facebook's acquisitions of Instagram and WhatsApp. The "kill" prong of the strategy was implemented by requiring third-party software applications that wanted access to Facebook's application programming interfaces ("API") to agree to anti-competitive provisions and enforcing those provisions by cutting off access for violations of those conditions. The "copy" prong was implemented by using its superior market penetration to thwart any benefit that nascent companies might develop from newly developed functionality.

5.     Facebook's maintenance of monopoly power is dependent on, and anchored by, the massive consumer data that it has culled from Facebook users since the creation of the platform. Consumers do not pay Facebook. Instead, when they create a Facebook account, they

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

are induced to agree to terms, created and required by the Company, by which users agree to Facebook's collection and use of data gleaned from consumers as they use the Facebook platform. As set forth in Facebook's Terms of Service:[1]

> Instead of paying to use Facebook and the other products and services we offer, by using the Facebook Products covered by these Terms, you agree that we can show you ads that businesses and organizations pay us to promote on and off the Facebook Company Products. We use your personal data, such as information about your activity and interests, to show you ads that are more relevant to you.

6.      Implicit in Facebook's Terms of Service is the notion that Facebook's use of collected consumer data is solely to generate advertising revenue from "businesses and organizations that pay us to promote" . . . and "show you ads that are more relevant to you." Thus, while Facebook requires that users grant the Company "[p]ermission to use your name, profile picture, and information about your actions with ads and sponsored content[,]" Facebook's Terms of Service include representations regarding Facebook's commitment to consumer privacy, stating that "[p]rotecting people's privacy is central to how we've designed our ad system."

7.      Facebook monetizes the data gleaned from users, which has allowed Facebook to reach a market capitalization of approximately $780 billion. Facebook attributes its own value to user data, using the term average revenue per user ("ARPU") which, in 2019, Facebook valued at over $41 per user in the United States and Canada.[2]

8.      The substantial value that Facebook gains from its users is one sided – Facebook's ARPU grows while Facebook's consumers do not gain more value for their data. Instead, consistent with its scheme, Facebook uses this growing revenue to stifle competition through its "acquire, copy, or kill" strategy, limiting consumer choice and squelching the value of consumer data to consumers even while extending its own profit from that data.

---

[1]      https://www.facebook.com/terms.php (last visited Dec.14, 2020).
[2]      https://www.adexchanger.com/platforms/facebooks-arpu-tops-41-in-north-america-but-ad-targeting-headwinds-havent-dissipated/ (last visited Dec. 14, 2020).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

9.      Facebook has used its dominant position to avoid competition on the merits, resulting in a lower quality product than consumers would receive in a competitive market.

10.     Absent Facebook's anti-competitive conduct, a competitive market would have required Facebook to provide consumers greater value in return for their valuable data. Instead, Facebook used its monopoly power to box out competition, taking consumer data without providing adequate compensation to its users. This constitutes antitrust injury. Through its deceptive and anti-competitive conduct, Facebook prevents competition on the merits, and the resultant lack of competition means that users receive less value for their data than they would have received otherwise and further means that users are deprived of alternatives for personal social networking.

11.     Facebook's actions violate the antitrust laws and harm consumers. This action seeks recovery for consumers' losses and Facebook's unlawful gains, as well as other appropriate equitable relief to prevent Facebook from continuing its anti-competitive conduct.

## II.      JURISDICTION AND VENUE

12.     This Court has original jurisdiction under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and Section 4 of the Clayton Act, 15 U.S.C. § 15. The Court also has subject matter jurisdiction over the state-law unjust enrichment claims presented in this action under 28 U.S.C. 1367 (supplemental jurisdiction). The Court also has diversity jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from Defendant, there are more than 100 class members nationally, and the aggregate amount in controversy exceeds $5,000,000.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Facebook transacts business within this District, carries out its affairs within this District, and carries out interstate trade and commerce though acts undertaken in this District.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

14.     This Court has personal jurisdiction over Facebook because it is subject to general jurisdiction in the State of California, where it maintains its headquarters and its principal place of business. In addition, Facebook's terms provide that consumers must bring these claims in the United States District Court for the Northern District of California or a state court located in San Mateo County. The schemes and acts alleged herein caused injury to Plaintiff and members of the classes defined herein throughout the United States, including consumers within this District. Moreover, Facebook also conducted substantial business from which the claims in this case arise in California and has agreed to personal jurisdiction in this Court.

15.     Facebook is headquartered, and conducts substantial business, including many of the unfair acts and practices complained of herein, in San Mateo County. Thus, pursuant to Civil Local Rule 3-2(c) and (e), this action is properly assigned to the San Jose Division of this District, which serves San Mateo County.

### III.     **PARTIES**

16.     Plaintiff Charles Steinberg is a citizen of the State of Pennsylvania, residing in Philadelphia. Mr. Steinberg opened a Facebook account in 2006, and, since doing so, has regularly accessed Facebook using both its mobile app and website. Mr. Steinberg created an Instagram account in 2019. Mr. Steinberg is also a user of Facebook Messenger. Since creating his Facebook account, Mr. Steinberg has attempted to adjust his privacy settings in order to control the disclosure of his data in Facebook. While Mr. Steinberg is concerned about Facebook's use of his personal data and is concerned that he is unable to control Facebook's use of his personal data, Mr. Steinberg continues to use Facebook platforms, including Facebook, Instagram, and Facebook Messenger, because they are ubiquitous and because there are no suitable alternatives for use in maintaining connections with friends and family.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

17.     Facebook is a Delaware Corporation and maintains its headquarters at 1601 Willow Road, Menlo Park, California. As of 2018, Facebook employed approximately 15,000 people in Menlo Park, California. Through several platforms, Facebook maintains a user base of more than 3.4 billion active users worldwide. These platforms include:

**Facebook**: The Company's core social media platform, which operates through both mobile apps and web-based applications through which it generates substantial revenue through, *inter alia*, advertising targeted at consumers based on data collected by Facebook.

**Instagram**: A social media platform used by consumers primarily for sharing photos and video as well as messaging. Instagram was acquired by Facebook in 2012.

**Messenger**: Facebook's messaging application, which allows Facebook users to share messages, photos, and videos in person-to-person communications.

**WhatsApp**: A secure person-to-person messaging application acquired by Facebook in 2014.

18.     In exchange for use of each of the above services, Facebook collects user data. This user data forms the basis for Facebook's principal revenue stream – targeted social media advertising. In 2019, Facebook generated approximately $70.7 billion in revenue, derived almost entirely from social media advertising.

IV.     **STATEMENT OF FACTS**

A.     **Facebook's Rise**

19.     After its founding in 2004, Facebook rapidly grew to become the preeminent personal social networking platform in the United States. At the time of Facebook's launch, the personal social networking market was nascent, and the largest existing platform was Myspace. Facebook's user base grew rapidly and, by 2008, Facebook's user base had eclipsed that of

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Myspace. By 2009, Facebook was firmly established as the most popular personal social networking platform in the United States. Since that time, Facebook has continued to grow and, by 2019, generated revenue of approximately $70.7 billion and profits in excess of $18.5 billion. But Facebook's continued dominance is not the result of winning competitive strategies carried out on an even playing field. Rather, it is due to Facebook's anti-competitive conduct summarized, in part, by Facebook founder Mark Zuckerberg, who stated that "it is better to buy than compete."

**B.** **The Relevant Market and Monopoly Power**

**1.** **The Personal Social Networking Market**

20.     Personal social networking services is a relevant product market. Personal social networking services are online services that enable, and are used by, people to maintain personal relationships and share experiences with friends, family, and other personal connections in a shared social space. For the following reasons, personal social networking services are a unique and distinct form of online service. First, personal social networking services are built on social graphs that map connections between users and their friends, family, and other personal connections. The social network graph is the foundation upon which users connect, share, and communicate with their personal connections. Personal social networking providers use the social graph as the backbone for the features they offer users. Second, personal social networking services include features used to interact with and share personal experiences in a shared social space. Personal social networking providers can use the social graph to inform what content they display to users in the shared social space and when. Third, personal social networking services include features that allow users to find and connect with other users to make it easier to expand and build their set of personal connections.

21.     The relevant geographic market is the United States. While the Company operates its various platforms, including Facebook, Instagram, and Facebook Messenger, among others, globally, the vast majority of users in the United States predominantly use the Company's platforms to connect with other users in the United States. Moreover, the ability of a platform to gain traction in another country or region is not readily transferable to the United States, so a social media user in the United States is not likely to engage extensively with a social media platform that is popular in the United States absent a substantial base of users within the United States.

22.     Personal social networking is distinct from, and not reasonably interchangeable with, other online services, such as subscription-based services like Netflix, Hulu, Spotify, and Apple Music because, while these services provide some limited forms of user interactions, they are primarily designed for the passive consumption of media and their financial models depend, entirely or in large part, on subscription revenue as opposed to advertising revenue.

23.     Personal social networking is also distinct from, and not reasonably interchangeable with, other forms of networking that are, by design, focused on narrower audiences such as LinkedIn, which focuses on professional and work-related interaction and networking

24.     Further, personal social networking is distinct from, and not reasonably interchangeable with, mobile messaging services. These services do not utilize a shared social space where users can interact, and do not rely on the social graph.  Users of mobile messaging services generally do not and cannot use the services to find contact information that they do not already possess or find other users connected to the people, places, things, and interests that

7

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

matter to them.  Instead, users of mobile messaging services employ the services to send communications to a small and discrete set of contacts entered by each user.

### 2.      Facebook's Monopoly Power

25.      Facebook provides personal social networking to its users through its original Facebook platform and its later-acquired Instagram platform.

26.      Facebook has been the dominant personal social networking provider in the United States since at least 2011.  Facebook has a dominant share of the personal social networking market, and as result of its anti-competitive conduct, it is likely to continue hold monopoly power.

27.      The personal social networking market has high barriers to entry and is durable. These entry barriers include network effects and high switching costs. Network effects refer to the value of user-to-user connections that are fostered by social media networks. Because connecting with other users and engaging in social interactions is the core purpose of social networking, networks that have a large base of active users have an inherent advantage over startup networks. Network effects are often described as direct, *i.e.,* the value an individual user puts on the network of contacts that he or she has developed, and indirect, *i.e.*, the value that an individual user puts on a particular network as an ecosystem for other services. Switching costs refers to the cost of switching from an established network, on which the user has built a substantial body of connections, to a new or competing network, on which the user will have to rebuild a network of connections, a problem exacerbated by the fact that new networks may lack a substantial user base, thus lacking the ability to foster as many connections as an existing and established network.

28.      Providers of personal social networking sell advertising that they display to users. Any positive indirect network effects between a personal social networking provider's services

8

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

to users and its sale of advertising to advertisers operate in only one direction: users are either indifferent to the amount of advertising that the personal social networking provider displays or would prefer fewer or no advertisements.

### C. Facebook's Anti-Competitive Conduct

#### 1. Implementation of Facebook's "Acquire, Copy, or Kill" Strategy

29.     In 2012, Facebook acquired Instagram, a social media application built around messaging and photo and video sharing. After being founded in 2010, Instagram managed to capitalize on changing trends in social media as users migrated from accessing social media on desktop computers to using app-based programs on smart phones, especially the iPhone, which provided users with the ability to take high quality photos and videos on their phone. Tapping into this new area of the market, Instagram grew rapidly, gaining one million registered users in the first month following the release of its app for the Apple iOS and ten million users within the first year of its release.  Recognizing the threat posed by Instagram's rapid growth, Facebook first sought to improve its own feature set on mobile devices, including adding the ability to share photos. Indeed, Facebook CEO Zuckerberg wrote internally "In the time it has taken us to get ou[r] act together on this[,] Instagram has become a large and viable competitor to us on mobile photos, which will increasingly be the future of photos."

30.     When additional features failed to address the competitive threat posed by Instagram, Facebook turned to its "it is better to buy than compete" strategy.  In a February 2012 email, Zuckerberg explained to Facebook Chief Financial Officer David Ebersman that acquisition of Instagram and similar competitors would allow Facebook to take advantage of its scale to crush potential competitors regardless of their feature sets:

> [T]here are network effects around social products and a finite number of different social mechanics to invent. Once someone wins at a specific mechanic, it's difficult for others

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

to supplant them without doing something different. It's possible someone beats Instagram by building something that is better to the point that they get network migration, but this is harder as long as Instagram keeps running as a product. [Integrating Instagram's functions into Facebook] is also a factor but in reality we already know these companies' social dynamics and will integrate them over the next 12-24 months anyway. The integration plan involves building their mechanics into our products rather than directly integrating their products if that makes sense. . . . [O]ne way of looking at this is that what we're really buying is time. Even if some new competitors spring[] up, buying Instagram, Path, Foursquare, etc now will give us a year or more to integrate their dynamics before anyone can get close to their scale again. Within that time, if we incorporate the social mechanics they were using, those new products won't get much traction since we'll already have their mechanics deployed at scale.

31.     On April 9, 2012, Facebook acquired Instagram. That same day, Zuckerberg wrote to a colleague: "one thing about startups . . . is you can often acquire them." Facebook's acquisition strategy, coupled with exclusionary tactics, served to snuff out competition, denying competitors the ability to "gain traction" while Facebook incorporated or "integrated" their social dynamics.

32.     The acquisition of Instagram eliminated Facebook's most significant personal social networking competitor. Controlling Instagram allowed the Company to keep Instagram from cannibalizing users from the Facebook platform even while freezing out potential competitors in the mobile photo and video sharing sphere.

33.     Witnessing the growth of personal messaging services, Facebook became concerned that such services might attempt to create competing personal social media networks.

34.     Facebook analyzed the landscape of messaging platforms and identified WhatsApp as the most significant threat to Facebook. WhatsApp, founded in 2009, had taken advantage of Apple Inc.'s inclusion of "push notifications," notifications that immediately alerted IOS users of new messages, to build a messaging platform that would tell users when other users were active on the platform. This unique functionality was later supplemented by the ability to

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

send photos and WhatsApp's user base grew exponentially, from 250,000 users in 2009 to 200 million active users by February 2013.

35.     By August 2013, the head of Facebook's mergers and acquisitions group warned that WhatsApp provided the "kind of mobile messaging is a wedge into broader social activity/sharing on mobile we have historically led in web." This threat in mind, Facebook decided to acquire the potential competitor. On February 19, 2014, Facebook announced that it was acquiring WhatsApp for $19 billion, the Company's largest acquisition to date. The price Facebook was willing to pay was a reflection of its understanding of the potential threat that WhatsApp posed. Indeed, on the day of the acquisition, Facebook employees recognized it as being "probably the only company which could have grown into the next FB purely on mobile[.]" Similarly, a market analyst at SunTrust Robinson Humphrey stated that "[w]e think WhatsApp and Facebook were likely to more closely resemble each other over time, potentially creating noteworthy competition, which can now be avoided."

36.     Facebook cannot substantiate the merger-specific efficiencies or other pro-competitive benefits sufficient to justify these acquisitions.

37.     In addition to using acquisitions as a tool to thwart competition, Facebook "kills" potential competition by enforcing anti-competitive conditions on third-party software providers that rely on Facebook data.

38.     Software providers use APIs to interconnect and share data with each other. Under guidelines set by Facebook, third-party applications can use Facebook APIs to add a wide range of functionality, such as adding a Facebook "Like" button to their products or allow Facebook users to see which third-party applications and websites their friends are using or accessing.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

39.     These APIs provide crucial infrastructure and exposure to third parties and they allow Facebook to both expand its user base by harnessing third-party software developers and maintain substantial control over the third-party software companies, which are dependent on the data accessed through Facebook APIs. Indeed, for many years, Facebook made key APIs available to third parties on the condition that those third parties would neither promote other social networks nor provide functionality that competed with the core offerings of the various Facebook platforms.[3] For example, in 2011, Facebook instituted a rule that "Apps on Facebook may not integrate, link to, promote, distribute, or redirect to any app on any other competing social platform." Similarly, beginning in 2011, Facebook barred access to its APIs to developers whose apps "replicat[ed] core functionality" of Facebook products. These policies were intended to harm and/or prevent competition from potential personal social networking competitors. Similarly, in September 2012, Facebook adopted a restriction stating that "Competing social networks . . . may not use Facebook Platform to export user data into a competing social network without our permission." And, in January 2013, updated its restriction on "core functionality", adopting the following restriction:

> Reciprocity and Replicating core functionality: (a) Reciprocity: Facebook Platform enables developers to build personalized, social experiences via the Graph API and related APIs. If you use any Facebook APIs to build personalized or social experiences, you must also enable people to easily share their experiences back with people on Facebook. (b) ***Replicating core functionality: You may not use Facebook Platform to promote, or to export user data to, a product or service that replicates a core Facebook product or service without our permission.*** (Emphasis added.)

40.     Facebook used these restrictions as a cudgel to stifle potential competitors. For example, in 2013, Facebook took actions against a potential competitor, Path, which was founded

---

[3]     Facebook discontinued these practices only in the face of substantial public scrutiny of Facebook's anti-competitive practices following the release of documents regarding its policies by the U.K. parliament in December 2018.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

by a former Facebook manager. In or around April 2013, Facebook terminated Path's access to Facebook APIs after which, Path's growth slowed significantly. Similarly, in December 2013, Facebook targeted Circle, which was attempting to develop a local social network. Recognizing Circle's potential as a competitor, a Facebook manager noted that "Circle positions itself as the 'local social network' and has seen some strong growth over the last four days (+800K downloads yesterday, +600K FB logins yesterday, #1 in the App Store in the UK)." That manager proposed that Facebook should cut off Circle's access to Facebook APIs. Facebook did so and, within weeks, Circle's daily tally of new users dropped to nearly zero. Facebook denied access to its APIs even after Circle had attempted to address the concerns that Facebook purported to be the actual basis for its termination of Circle's access to Facebook APIs.

41.    As with Path and Circle, Facebook used supposed violations of Facebook policies as a basis to strip access to Facebook APIs from other potential competitors, including Vine, which was denied access in 2013; Stackla, which was denied access in 2019; and MessageMe, which was denied access in 2013. While the Company adopted pretexts for these terminations, in truth, the terminations were based on the competitive threat posed by the applications. For example, in terminating access to another potential competitor, Ark, a former Facebook employee explained that "[i]t seemed clear that leadership imposed [a] more severe punishment against Ark because Mr. Zuckerberg viewed Ark as competitive with Facebook, as Facebook was exploring an acquisition of Ark at the same time as it was being investigated for policy violations."[4]

---

[4]    *Investigation of Competition in Digital Markets*, Majority Staff Report and Recommendations ("House Report"), Subcommittee on Antitrust, Commercial, and Administrative Law of the Committee on the Judiciary, at 169 (Oct. 6, 2020), https://kl.link/3jGISfK.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

42.     Facebook's manipulation of APIs effectively hindered, suppressed, or prohibited third-party apps that sought to access Facebook's massive base of installed users from including features that might challenge Facebook's dominance in the personal social networking market.

43.     Facebook cannot substantiate pro-competitive benefits sufficient to justify the anti-competitive API access provisions and the enforcement of those provisions.

### 2.     Facebook's Failure to Protect User Data

44.     In March 2018, it was revealed that Cambridge Analytica ("Cambridge"), an English political consulting firm had been using apps that took advantage of Facebook APIs to harvest data from Facebook users. Through a Cambridge app called "This Is Your Digital Life," Cambridge had accessed the personal data of approximately 87 million Facebook users. That data was then used to create psychological profiles of users that Cambridge marketed to its clients. While Facebook banned Cambridge from its platforms following the disclosure, subsequent investigations uncovered the fact that, at least since 2015, Facebook was aware that it was unable to track how many of the app developers using Facebook APIs were using the data that they gleaned from Facebook.[5]

45.     Indeed, Facebook's APIs allowed third parties to access not only the data of Facebook users who utilized the third-party apps via Facebook, but also the friends of those Facebook users. This practice had been the subject of a 2011 complaint filed by the Federal Trade Commission and, pursuant to a settlement between the Company and the FTC reached in 2012, Facebook agreed that it "shall not misrepresent in any matter, expressly or by implication, the extent to which [Facebook] maintains the privacy or security of Covered Information, including . . . [Facebook's collection, use, or disclosure of any Covered Information[.]" Despite this

---

[5]     Kurt Wagner, *Here's how Facebook allowed Cambridge Analytica to get data for 50 million users*, Vox (Mar. 17, 2018), https://kl.link/2ToOFLZ.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

settlement, and representations by Facebook to consumers, Facebook continued to allow access to the data of Facebook users' friends until 2016.

46.     Even after 2016, Facebook still allowed at a broad range of third parties to access the data of users' friends, a fact that Facebook users only came to know after the news of the Cambridge scandal broke. Indeed, in a 2019 complaint against Facebook, the United States Department of Justice alleged that "[t]he full scale of unauthorized collection, use, and disclosure of consumer information resulting from Facebook's conduct is unknown due, at least in part, to the company's lack of recordkeeping." *United States, v. Facebook, Inc.*, 1:19-cv-02184 (D.D.C.), Dkt. 1, ¶ 126.

47.     It wasn't until September 2019, when Facebook acknowledged that it had suspended tens of thousands of thirds party apps for misuse of the personal data of Facebook users that the public began to grasp the extent of Facebook's failure to protect user data. Ultimately, Facebook disclosed that it had suspended approximately 69,000 apps from its platforms, at least 10,000 of which were flagged for potentially misusing and/or misappropriating the personal data of users.[6]

### D. Facebook's Anti-Competitive Practices Harmed, and Continue to Harm, Competition in the Personal Social Networking Market

48.     Facebook's anti-competitive practices, as described herein, have harmed, and continue to harm competition in the personal social networking market in the United States.  The tactics deployed by Facebook in its "acquire, copy, or kill" strategy have stifled competitors in the personal social networking market in the United States, and have prevented meaningful

---

[6]     *See* Facebook, *An Update on Our App Developer Investigation* (Sept. 20, 2019), https://kl.link/31FSVeP (last visited on Dec. 14, 2020).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

competition in the market. As a result of this anti-competitive behavior, consumers, such as Plaintiff and the Class, have been deprived of the benefit of a competitive market.

49.     The benefits to consumers of a competitive market include additional innovation, improvements, and consumer choice, including, but not limited to, broader choice in data privacy options and control over exposure to advertising.

50.     Absent Facebook's anti-competitive behavior, consumers would have access to more options in the personal social networking market, including social media networks that compete with Facebook in terms of platform quality, provision of additional features and service, and great user control over data privacy.

51.     Consumers' use of Facebook is conditioned on the provision of user data to Facebook, data which Facebook in turn uses to generate advertising revenue. As set forth herein, the value of consumer data is quantifiable. In the absence of Facebook's anti-competitive tactics, Facebook would have to provide greater value to consumers in order to succeed in a truly competitive market. Facebook's anti-competitive tactics have thus decreased the value of the data provided by consumers to Facebook.

52.     The anti-competitive strategy and tactics used by Facebook are not supported by business justifications or pro-competitive benefits, but instead exist in furtherance of Facebook's monopoly.

## V.     INTERSTATE TRADE AND COMMERCE

53.     Facebook's anti-competitive conduct has taken place in, and negatively affected the continuous flow of interstate trade and commerce in the Unites states as follows:

a)     Facebook has utilized the instrumentalities of interstate commerce to provide personal social networking to consumers in and throughout the United States;

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

b) Facebook has harvested and exchanged user data with advertisers throughout the United States;

c) Facebook and its agents have, in the furtherance of its anti-competitive scheme, travelled between states and communicated through interstate wire communications and the United States mail; and

d) Facebook has, as a result of its anti-competitive scheme, inflicted antitrust injury on consumers throughout the United States, artificially limiting consumer choice in the personal social networking market. This scheme has affected billions of dollars of commerce in the United States

## VI.  **TOLLING OF THE STATUTE OF LIMITATIONS**

54.     Plaintiff had no knowledge of Facebook's anti-competitive conduct or of facts sufficient to place him on inquiry notice of the claims asserted herein during the class.

55.     Nor could Plaintiff have discovered, through the exercise of reasonable diligence, the existence of the anti-competitive acts alleged herein until, as pleaded herein, they were revealed to the public.

56.     Additionally, Facebook has fraudulently concealed its anti-competitive conduct. As a result, Plaintiff and members of the classes were unaware of Facebook's unlawful conduct alleged herein.

57.     Plaintiff had no knowledge of Facebook's wrongful acquisition and maintenance of monopoly power in the relevant market, or of facts sufficient to place him on inquiry notice of his injuries or the other bases for his causes of action, during the class period and continuing thereafter.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

58.     Facebook concealed its anti-competitive conduct, both by failing to disclose its wrongful acquisition and maintenance of a personal social networking monopoly through exclusionary acts in the relevant market, and by affirmatively denying that it was engaged in such conduct. Facebook has repeatedly publicly denied allegations by government regulators that it has abused its power in the personal social networking market.

59.     Accordingly, the statute of limitations should be equitably tolled, and all of the anti-competitive conduct described in this Complaint presents timely claims.

## VII.   CLASS ACTION ALLEGATIONS

60.     Plaintiff re-alleges and incorporates by reference herein all the allegations contained above.

Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff asserts claims on behalf of the following Classes:

a)  **The Antitrust Class**: All persons or entities in the United States who maintained a Facebook profile at any point from 2007 through the date of the filing of this action.
b)  **The Unjust Enrichment Class**: All persons or entities in the United States who maintained a Facebook profile at any point from 2007 through the date of the filing of this action.

61.     Excluded from the above-defined Classes are Facebook, any entity in which Facebook has an interest, and any of Facebook's corporate parents, affiliates, and subsidiaries. Also excluded from the above-defined Classes are any judge, justice, or judicial officer presiding over this matter, their immediate families, and the members of their judicial staff.

62.     Plaintiff reserves the right to amend the Class definitions set forth above if discovery and further investigation reveal that the Classes should be expanded, divided into subclasses, or modified in any other way.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

63.     The members of the Class are so numerous that joinder is impracticable. The Class includes at least hundreds of thousands of members that are widely dispersed throughout the United States.

64.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

65.     This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements of Rule 23(b)(3). Plaintiff seeks to represent ascertainable Classes, as determining inclusion in the classes can be done through Facebook's own records.

66.     Questions of law and fact common to the putative Classes exist and predominate over questions affecting only individual members, such as:

a)      Whether Facebook's deception of consumers about its data privacy practices was anti-competitive;
b)      Whether Facebook's acquisition conduct was anti-competitive;
c)      Whether Facebook intentionally engaged in anti-competitive acts in order to obtain or maintain monopoly power;
d)      Whether Facebook constitutes a monopoly in the personal social networking market;
e)      Whether Facebook foreclosed competition in the personal social networking market and thus caused economic harm to consumers;
f)      Whether Facebook's deception of consumers regarding its data privacy policies and their implementation constituted an anti-competitive act; and
g)      Whether Facebook's anti-competitive conduct should be enjoined and whether Facebook should be subject to other equitable relief.

67.     Plaintiff's claims are typical of the Classes he seeks to represent and arise from the same course of conduct by Facebook and the relief sought by Plaintiff is common.

68.     Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

69.     Plaintiff is willing and prepared to represent and serve the Classes and undertake all of the obligations and duties material to such representation and service. Plaintiff will fairly and adequately protect the interests of the Classes and has no interests averse to, or otherwise in conflict with, the interests of the other members of the Classes.

70.     Plaintiff's interests are co-extensive with, and are not antagonistic to, the interests of the absent members of the Classes. Plaintiff will represent and protect the interests of absent members of the Classes and, in doing so, will vigorously prosecute this action.

71.     Plaintiff has engaged the services of undersigned counsel. Counsel is experienced in complex litigation, including class action litigation such as this, and is prepared to vigorously prosecute this action on behalf of Plaintiff and the Classes.

72.     The Classes may also be certified under Rule 23(b)(2) because Facebook has acted on grounds generally applicable to the Classes, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Classes.

## VIII.   <u>CAUSES OF ACTION</u>

**First Cause of Action**
**Monopolization in Violation of §2 of the Sherman Antitrust Act**

73.     Plaintiff re-alleges and incorporates by reference herein all the allegations contained above.

74.     Facebook has willfully acquired and maintained monopoly power in the personal social networking market. There are there have been no reasonably interchangeable products that could effectively constrain, or have effectively constrained, Facebook from imposing and profitably sustaining during the relevant period a significant artificial decrease in compensation

to consumers for their user information. Facebook has also maintained the power to impose and profitably sustain lower levels of data privacy protections and personal social networking quality than would occur in a world where Facebook had not illegally monopolized the personal social networking market. Facebook has the power to control prices and exclude competition in the personal social networking market.

75.   Facebook has dominant market share in the personal social networking market.

76.   Facebook has willfully aquired and maintained monopoly power in in the personal social networking market. These means include predatory, exclusionary, and anti-competitive conduct, including but not limited to: utilization of its "acquire, copy, or kill" strategy to destroy potential competitors; inducing users to join Facebook through a pattern of deception regarding its handling of users' personal information; and using the massive troves of data collected from users in the course of implementing its strategy.

77.   High barriers to entry in the personal social networking market, including network effects and high switching costs, make it unlikely that a competitor can take substantial market share from, or effectively compete with, Facebook in the personal social networking market

78.   By eliminating competition in the personal social networking market, Facebook decreased compensation to consumers for the information that consumers provided to Facebook, providing lower value than consumers otherwise could have achieved in a competitive market.

79.   The hindrance of competition caused injury to Plaintiff and the Class, who received lower compensation and lower value from Facebook than those consumers would have received had Facebook competed on the merits. Plaintiff and the Class were injured and received substantially less compensation and lower value than they would have absent Facebook's

21

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1  unlawful and anti-competitive conduct. Plaintiff and the Class will continue to be injured in their

2  property as a result of Facebook's conduct.

3      80.    There is no legitimate pro-competitive or business justification for Facebook's

4  anti-competitive conduct as alleged herein, and the anti-competitive effects of Facebooks acts

5  outweigh any conceivable pro-competitive effects.

6

7      81.    Facebook's acts and practices have continued to be anti-competitive in nature and

8  tendency and constitute an unfair method of competition in violation of Section 2 of the Sherman

9  Act, 15 U.S.C. § 2.

10     82.    Facebook's conduct has had a substantial effect on interstate commerce.

11     83.    Plaintiff and Class members have been and will continue to be injured in their

12  property as a result of Facebook's conduct.

13

14     84.    Plaintiff and Class members have suffered, and will continue to suffer, injury of

15  the type that the antitrust laws were intended to prevent, including, but not limited to: (a) higher

16  costs in terms of their personal information; (b) a reduction in consumer choice; and (c) being

17  forced to accept a lesser quality of service as a result of reduced competition.

18     85.    Plaintiff and the Class seek an award of treble damages or, in the alternative,

19  disgorgement of Facebook's ill-gotten gains. Plaintiff also seeks appropriate equitable relief to

20  enjoin Facebook from continuing to engage in anti-competitive behavior to the detriment of

21  consumers and to remedy the harms that Facebook's monopolization of the personal social

22  networking market has caused, including: (a) divestment of assets that would continue to entrench

23  its monopoly power; and (b) requiring Facebook to submit to independent monitoring of its user

24  privacy practices, data surveillance, and acquisition conduct.

25

26

27

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**Second Cause of Action**
**Attempted Monopolization in Violation of § 2 of the Sherman Antitrust Act**

86.     Plaintiff re-alleges and incorporates by reference herein all the allegations contained above.

87.     Facebook has engaged in predatory, exclusionary, and anti-competitive conduct in the personal social networking market by, including but not limited to; (a) obtaining market share in the personal social networking market through a pattern of deceiving consumers; and (b) exploiting the data it obtained from consumers through deception to systematically destroy competition in the personal social networking market.

88.     Facebook's conduct has had an anti-competitive effect in the personal social networking market.

89.     Facebook's conduct has no legitimate business purpose or pro-competitive effect, and even if there were, the anti-competitive effects would far outweigh any possible pro-competitive effects.

90.     Facebook has engaged in the anti-competitive conduct described herein with the specific intent of monopolizing the personal social networking market.

91.     Facebook has engaged in the anti-competitive conduct described herein with a dangerous probability of monopolizing the personal social networking market.

92.     Facebook's conduct has had a substantial effect on interstate commerce.

93.     Plaintiff and Class members have, as a result of Facebook's conduct, suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: (a) lower compensation for their personal information; (b) a reduction in consumer choice; and (c) being forced to accept a service of lesser quality because of reduced competition.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

94.    Plaintiff and the Class seek an award of treble damages or, in the alternative, disgorgement of Facebook's ill-gotten gains. Plaintiff also seeks appropriate equitable relief to enjoin Facebook from continuing to engage in anti-competitive behavior to the detriment of consumers and to remedy the harms that Facebook's monopolization of the personal social networking market has caused, including: (a) divestment of assets that would continue to entrench its monopoly power; and (b) requiring Facebook to submit to independent monitoring of its user privacy practices, data surveillance, and acquisition conduct.

**Third Cause of Action**
**Unjust Enrichment**
**(On Behalf of the Unjust Enrichment Class)**

95.    Plaintiff re-alleges and incorporates by reference herein all the allegations contained above.

96.    Pursuant to the Facebook Terms of Service, Facebook and each class member have agreed that "that the laws of the State of California will govern these Terms and any claim [against Facebook], without regard to conflict of law provisions."

97.    Through the misconduct alleged herein, Facebook has been unjustly enriched.

98.    Plaintiff and the Class have conferred benefit on Facebook in the form of personal data and information.

99.    These benefits have a quantifiable value to Facebook. For example, in 2019, Facebook valued its ARPU at over $41 per user in the United States and Canada. That same year, Facebook generated revenue of approximately $70 billion, nearly all of which was generated from advertising revenue derived from advertising to its user base, the Class.

100.    Facebook acquired these benefits from Plaintiff and Class members through misrepresentations and deception. Facebook induced Plaintiff and Class members to join Facebook based on the promise of stringent privacy protections. Despite this promise, Facebook

24

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

concealed the scope of the data it harvested from Plaintiff and Class members and concealed the scope of the data that it brokered to third parties. Facebook further concealed the extent and manner to which it used the data of Plaintiff and the Class to crush potential competition through its "copy, kill, or acquire" strategy.

101.     While Plaintiff and Class member conferred on Facebook the benefit of their data and information, Facebook's misconduct, as alleged herein, has: (a) deprived Plaintiff and the Class of a marketplace that adequately compensates them for their data and information with benefits of reciprocal value; and (b) forced Plaintiff and the Class to accept Facebook's services, which are of inferior quality, with no meaningful alternative.

102.     It would be unfair, unscrupulous, unjust, and inequitable to allow Facebook to retain the value it wrongfully derived from the benefits conferred upon it by Plaintiff and the Class.

103.     Plaintiff and the Class accordingly seek disgorgement of Facebook's profits resulting from the wanton misconduct alleged herein.

**Fourth Cause of Action**
**Violation of the Unfair Competition Act**
**(Cal. Bus. & Profession Code, § 17200, *et seq.*)**

104.     Plaintiff re-alleges and incorporates by reference herein all the allegations contained above.

105.     Plaintiff brings this cause of action on behalf of the Class.

106.     Pursuant to California's Unfair Competition Law ("UCL"), any "unlawful, unfair, or fraudulent" business act or practice constitutes "unfair competition," and is thus a violation of California law. Cal. Bus. & Prof. Code § 17200, *et seq*.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

107.    As alleged herein, Facebook has engaged in, and continues to engage in, acts of unfair competition as defined in the UCL. Specifically, the conduct alleged herein constitutes violations of both the unlawful and unfair prongs of the UCL.

108.    Facebook's conduct, complained of herein, took place in, and otherwise emanated from, California. In addition, pursuant to Facebook's Terms of Service, "the laws of the State of California will govern these Terms and any claim [against Facebook], without regard to conflict of law provisions."

109.    Plaintiff and the Class are consumers.

110.    The unfair competition complained of includes the violations of the Sherman Act alleged herein, which constitute violations of the unlawful prong of the UCL.

111.    Facebook's conduct has harmed Plaintiff, the Class, Facebook's potential competitors, and the general public. In exchange for access to the Facebook platforms, users, such as Plaintiff and the Class, provide material benefits to Facebook in the form of their personal data and information. These benefits have a quantifiable value to Facebook. For example, in 2019, Facebook valued its ARPU at over $41 per user in the United States and Canada. That same year, Facebook generated revenue of approximately $70.7 billion, nearly all of which was generated from advertising revenue derived from advertising to its user base, the Class.

112.    Plaintiff and the Class are entitled to recover restitution.

113.    Plaintiff, a current and active user of Facebook, is also entitled to injunctive relief to prevent Facebook from continuing to engage in unlawful, inequitable, and unjustified behavior to Plaintiff's detriment and the detriment of Plaintiff's fellow members of the Class. Thus, Plaintiff seeks to an injunction requiring Facebook to halt the wrongful acts described herein.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

## IX.     PRAYER FOR RELIEF

114.     Plaintiff, on behalf of himself and the Classes, seeks the following relief:

a) An order certifying this action as a class action under Fed. R. Civ. 23, defining the Classes as requested herein, finding that Plaintiff is a proper representative of the Classes requested herein, and appointing Plaintiff's counsel as Class Counsel;

b) Treble damages or, alternatively, restitution and/or disgorgement of all amounts wrongfully obtained;

c) Injunctive and other equitable relief as is necessary to protect the interests of the Classes;

d) Declaratory relief, including but not limited to a declaration that Facebook's conduct, as alleged, herein violates the laws alleged herein;

e) Attorneys' fees, statutory costs, and other costs of suit herein incurred, for both pre-judgment and post-judgment interest on any amounts awarded; and

f) Such other relied as the Court may deem just and proper.

## X.     DEMAND FOR JURY TRIAL

115.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues in this action so triable.

Dated: December 17, 2020

**BARRACK, RODOS & BACINE**

___/s/SAMUEL M. WARD_____
SAMUEL M. WARD

STEPHEN R. BASSER
SAMUEL M. WARD
One America Plaza
600 West Broadway, Suite 900
San Diego, CA  92101
Phone: (619) 230-0800
Fax:  (619) 230-1874
Email: sbasser@barrack.com
          sward@barrack.com

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

and

**BARRACK, RODOS & BACINE**
DANIEL E. BACINE*
JEFFREY B. GITTLEMAN*
MEGHAN J. TALBOT*
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Phone: (215) 963-0600
Fax: (215) 963-0838
Email: dbacine@barrack.com
          jgittleman@barrack.com
          mtalbot@barrack.com

*Attorneys for Plaintiff*
*\*Pro Hac Vice Applications forthcoming*

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL